**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| **VANESSA M. HARDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 6:12-CV-00069** |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Vanessa M. Harder ("Harder") filed this action challenging the final decision of

the Commissioner of Social Security, ("Commissioner"), finding her not disabled and therefore

ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42

U.S.C. §§ 401–433. Specifically, Harder alleges that the Administrative Law Judge ("ALJ")

gave improper weight to the opinion of Loretta Braxton, Ph.D., a consulting psychologist, in

determining Harder's Residual Functioning Capacity ("RFC"). Harder does not challenge the

ALJ's decision with respect to her physical impairments.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is

before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed all

issues and the case is now ripe for decision. I have carefully reviewed the administrative record,

the legal memoranda, and the applicable law. I conclude that the ALJ committed no error in

according less weight to portions of Dr. Braxton's opinion and that substantial evidence supports

the ALJ's decision as a whole. As such, I **RECOMMEND DENYING** Harder's Motion for

Summary Judgment (Dkt. No. 12), and **GRANTING** the Commissioner's Motion for Summary

Judgment.  Dkt. No. 14.

<u>**STANDARD OF REVIEW**</u>

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the

Commissioner's denial of social security benefits.  <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir.

2001).  This court limits its review to determining whether substantial evidence exists to support

the Commissioner's conclusion that Harder failed to demonstrate that she was disabled under the

Act.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance."  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996)

(internal citations omitted).  If such substantial evidence exists, the final decision of the

Commissioner must be affirmed.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

Harder bears the burden of proving that she is disabled within the meaning of the Act.

<u>English v. Shalala</u>, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)).  The Act

defines "disability" as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment, which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  Disability under the Act requires showing more than the

fact that the claimant suffers from an impairment which affects her ability to perform daily

activities or certain forms of work.  Rather, a claimant must show that her impairments prevent

her from engaging in all forms of substantial gainful employment given her age, education, and

work experience.  <u>See</u> 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim.  Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work.  Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460-462 (1983).  The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability.  The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Harder was born on March 15, 1965 (Administrative Record, hereinafter "R." at 111), and is considered younger person under the Act.  20 C.F.R. §§ 404.1563(c).  Harder was insured through March 31, 2012 (R. 22); therefore she must show that her disability began before the end of her insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).  Harder completed school through 11th grade, obtained a GED, and attended two years of community college. R. 39.  In the past Harder has worked as a warehouse packer (medium, unskilled work performed at light exertional level), floor coverer (medium, skilled work), restaurant equipment salesperson

(light, skilled work), machine shop secretary (light, semi-skilled work), and as a cabinet assembler (medium, semi-skilled work). R. 59, 146. Harder reported that during the relevant period, she had the capacity to take care of her mother-in-law, which included trips to the doctor's office, making her meals, and "anything else she need[ed]." R. 152–53. Harder's daily activities also included taking care of her dogs, preparing frozen meals, washing clothes, moving furniture, mowing and maintaining the lawn, shopping, handling finances, and light cleaning work, and going to church. R. 153–56.

### Claim History

Harder protectively filed for DIB on August 18, 2009, claiming that her disability began on July 1, 2008. R. 20. The state agency denied her application at the initial and reconsideration levels of administrative review. R. 20, 111. On July 6, 2011, ALJ Brian B. Rippel held a hearing to consider Harder's disability claim. R. 35-65. Harder was represented by an attorney, Robert J. Golcheski, at the hearing, which included testimony from Harder, her husband, and vocational expert Ashley Wells. R. 35–65.

On July 28, 2011, the ALJ entered his decision denying Harder's claims. R. 20–31. The ALJ found that Harder suffered from severe impairments to include a spine disorder, affective disorders (depression and bipolar disorder), and anxiety disorder. R. 22. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 22–24. The ALJ further found that Harder retained the residual functional capacity ("RFC") to perform "less than the full range of light work as defined in 20 CFR 404.1567(b) in that she is limited to work consisting of simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes. Further, the work must involve no

interaction with the public and no more than occasional interaction with co-workers and supervisors." R. 24–25.  The ALJ determined that Harder could not return to her past relevant work as a restaurant equipment salesperson, cabinet assembler, floor coverer, secretary, and warehouse worker (R. 29), but that Harder could work at jobs that exist in significant numbers in the national economy: namely night cleaner, laundry folder, and addressing clerk.  R. 30.  Thus, the ALJ concluded that she was not disabled.  R. 31.  On October 5, 2012, the Appeals Council denied Harder's request for review (R. 1–3), and this appeal followed.

## ANALYSIS

Harder argues in this appeal that the ALJ improperly weighed portions of the opinion of a consulting psychologist, Loretta Braxton, Ph.D. in determining Harder's RFC. Dr. Braxton, a licensed clinical psychologist, examined Harder on April 23, 2010 on behalf of the Virginia Employment Commission and the Virginia Department of Rehabilitative Services. R. 279. Dr. Braxton diagnosed Harder with bipolar disorder and found that she had a Global Assessment of Functioning ("GAF") of 53 at the time of the examination. Dr. Braxton stated that "[h]er current psychiatric condition would compromise her ability to perform simple, routine, repetitive tasks and maintain concentration, persistence and pace." R. 282. The ALJ accorded Dr. Braxton's report great weight, but found that the longitudinal evidence in the record or Harder's GAF of 53 did not support her conclusions regarding Harder's ability to perform simple, routine, repetitive tasks and maintain concentration, persistence and pace.  R. 29. The ALJ is the fact finder and is charged with the duty to weigh the evidence, and I must affirm his decision where, as here, substantial evidence supports the conclusions drawn from the evidence of record.

When making an RFC assessment, the ALJ must assess every medical opinion received into evidence. 20 CFR §404.1527(c). Under 20 CFR §§ 404.1527(c)(1) and 404.1527(c)(2), the

ALJ must give more weight to the opinion of a consultative examining source than a non-examining source. Similarly, the opinion of a treating source receives greater weight than that of a consultative examining source. In evaluating the weight to give the opinion of a consulting examiner, such as Dr. Braxton, the ALJ must consider various factors, including the explanation and support for the opinion, as well as its consistency with the record as a whole. 20 C.F.R. §§ 404.1527(c), 416.927(c). Ultimately, the ALJ must consider the opinions received in light of the evidence of record and the ALJ must determine whether the record supports the opinions offered.

"State agency medical and psychological consultants … are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation," and therefore, the ALJ "must consider their findings except for the ultimate determination about whether a claimant is disabled." 20 CFR § 404.1527(e)(2)(i). While an examining physician's opinion is generally accorded more weight than a non-examiner's opinion, if an "opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.2001) (citing Craig v. Chater, 76 F.3d 385, 590) (4th Cir. 1996). Moreover, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96–8p, 1996 WL 374184, *7 (July 2, 1996)).[1] The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave" to the opinion and "the reasons for that weight." S.S.R. 96–2p, 1996 WL 374188, at *5 (July 2, 1996)).

---

[1] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

Here, the longitudinal record supports the ALJ's decision to discount the portion of Dr. Braxton's opinion concerning Harder's ability to perform simple, routine, and repetitive tasks and maintain her concentration and persistence. The relevant medical evidence regarding Harder's mental health shows that Harder visited Heidi Kind, D.O. on January 28, 2008 in part for a follow-up on symptoms of depression and anxiety, and reported to Dr. Kind that she had stopped using the anti-depressant Efflexor because it "made her jittery and she was unable to sleep on it." R. 242. Harder stated she was reporting for a six month jail sentence two days after the visit. As a result, Dr. Kind decided to hold off on trying other depression medications preferring instead to have her seen while incarcerated and further noting that "[s]he has been off it now and doing okay for the time being." R. 242. After serving her sentence, Harder followed up with Dr. Kind on July 12, 2008 and reported that she was not allowed to take Effexor in jail and that she was having worsening symptoms. R. 240. Dr. Kind noted her depression, but found her mental status as intact and clear, coherent, and not aggressive, and referred her to psychiatry for evaluation. R. 240.

Harder saw psychiatrist Dr. John Wilson at the Piedmont Psychiatric Center numerous times between March 2009 and October 2010. At Harder's initial visit on March 18, 2009, Dr. Wilson's diagnostic impressions included delusional disorder, bipolar disorder, and drug abuse in partial remission. R. 252. Dr. Wilson found Harder to be alert and adequately dressed, with a euphoric mood, bright affect, and spontaneous speech. Harder's cognition was intact, her thoughts were logical, and she expressed partial insight with fair judgment. R. 252. Furthermore, Harder denied any suicidal ideations to Dr. Wilson, as she would for the duration of her treatment under him.

On April 16, 2009, Harder reported mood swings and Dr. Wilson observed Harder's mood to be dysthymic and her affect restricted. R. 251. Otherwise, Harder's mental status exam remained unremarkable. Dr. Wilson prescribed Abilify to combat Harder's mood swings, and by her next visits in June, July, and August 2009 Harder's mood had stabilized. R. 249–50. Dr. Wilson noted that Harder's husband stated that she was much improved on her medication and that Harder herself reported "so far so good." R. 249. The remainder of Dr. Wilson's mental status exams of Harder in June, July, and August 2009 all were unremarkable. R. 248–50. In September 2009, Harder reported that she had some of her "same old thoughts" but that her mood remained stable. R. 273. Harder's next two examinations by Dr. Wilson in December 2009 and February 2010 produced similar unremarkable findings, although Dr. Wilson noted Harder's restricted affect in February 2010. R. 287.

At her next visit with Dr. Wilson at Piedmont Psychiatric on May 4, 2010, Harder reported that she was still having some mood swings related to marital problems, but Dr. Wilson noted she was alert, that her cognition was intact, and that she had logical thoughts. R. 285. Dr. Wilson asked her to comply with therapy, continue her medication, and have some lab work done. R. 285.

Dr. Wilson found Harder's mood to be stable in July 2010, and although the following month Harder reported a "full panic attack" and more mood swings, Dr. Wilson's mental status examination was unremarkable. R. 283. Dr. Wilson adjusted Harder's medication, and advised her to return to the clinic in two weeks.  Harder visited Dr. Wilson again on October 13, 2013, and expressed grief over her mother's recent death. R. 296. Dr. Wilson adjusted her medication once more, including an increase in dosage of Celexa, an anti-depressant. Despite her grief, Harder's mental status exam remained largely unremarkable.

Loretta Braxton, Ph.D. performed the consultative examination which is the focus of this appeal on April 23, 2010. R. 279–82. As part of the exam, Dr. Braxton both conducted a clinical interview and reviewed Harder's available medical records. Harder's chief complaint to Dr. Braxton was that she had "memory problems," although Dr. Braxton found her memory for events both recent and remote to be intact. R. 279, 281. She reported difficulties getting along with family and co-workers and that she had problems with racing thoughts, disrupted sleep, anxiety, and panic attacks. R. 279. Dr. Braxton further noted that Harder was never hospitalized for mental health problems.

In the examination, Dr. Braxton observed Harder to be cooperative and compliant with her instructions, that her affect was consistent, and that her emotions were appropriate during the interview. R. 280. Harder stated that she took care of her mother-in-law and that she was capable of performing daily activities without any assistance, with the exception of problems managing her money. R. 280. Dr. Braxton's mental status examination found Harder's mood to be nervous and her affect consistent, but the remainder of her evaluation was essentially unremarkable. Dr. Braxton diagnosed Harder with bipolar disorder and a GAF of 53. In her summary of conclusions, Dr. Braxton stated:

> [Harder] has a long history of difficulty getting along with others, particularly her coworkers and family. Her current psychiatric condition would compromise her ability to perform simple, routine, repetitive tasks and maintain concentration, persistence and pace. She seems capable of understanding but may have difficulty retaining and following instructions.

R. 282.

State agency clinical psychologist Jo McClain, P.C. conducted a consultative examination of Harder on May 18, 2010. R. 181–92. In addition to reviewing Harder's existing records, Ms. McClain consulted with Dr. Wilson by phone, who indicated that Harder's

delusional disorder mainly impacts her marital relationship. R. 185.  Ms. McClain indicated that

Harder did not have understanding and memory limitations, but that Harder did have some

sustained concentration and persistence limitations. R. 188. Ms. McClain classified Harder's

ability to maintain attention and concentration as moderately limited, further explaining that

"[d]uring [Harder's] brief periods of manic symptoms, her concentration and persistence would

be impaired to some extent." R. 189. In explaining her social interaction limitations, Ms.

McClain stated that Harder "has a history of interpersonal difficulties, however, it appears that

the most severe instances of these difficulties were in domestic type situations and possibly

alcohol related." R. 189. In conclusion, Ms. McClain stated that Harder would "retain the ability

to perform simple, unskilled work without extensive requirements for social interaction." R. 190.

State agency psychologist Julie Jennings, Ph.D. conducted a second review of Harder's

condition on October 27, 2010, and came to the same conclusions as Ms. McClain. R. 199–211.

The Personalized Decision Notice on the Disability Determination Explanation explained to

Harder that "[a]lthough you have depression and bipolar [sic], medical records show you are able

to perform simple, routine work that does not require a great deal of contact with other people."

R. 211.

On April 1, 2011, Harder was seen at Johnson Health Services for mental health

counseling from Lynn McBride, Ed.S., LPC, LMFT, CSAC, and Barbara Rodgers, LPC.  The

records of Johnson Health Services show that Harder was depressed but cooperative, with good

attention, normal awareness, proper orientation, fair insight, fair judgment, and thought processes

intact. R. 314. Harder reported that she had stopped all of her medications due to cost, and that

her symptoms of depression and anger thereafter deteriorated. R. 314. The records also show that

Harder's symptoms interfered with her employment and that she had recently been laid off from

her job at a candle factory, but that she may be called back and that she was looking for employment. R. 308–310. Harder apparently got her job back at the candle factory, because the record of May 20, 2011 shows that Harder again lost that job when she fell asleep standing up— a situation she attributed to her medication regimen. R. 306.

At later counseling visits to Johnson Health Services in May 2011, Harder continued to report depression and problems with her medication causing sedation. R. 301, 306. Ms. Rodgers urged Harder to tell her primary care physician and pain management doctor about her mental health medication for readjustment so as to avoid possible drug interactions. R. 306.

This medical history provides sufficient support for this court to uphold the ALJ's decision to accord little weight to Dr. Braxton's opinion that that Harder's "current psychiatric condition would compromise her ability to perform simple, routine, repetitive tasks and maintain concentration, persistence and pace." R. 282. The medical records show that Harder's bipolar and delusional symptoms were largely controlled by medication, and that when she was compliant with her treatment regimen her mental health was stable. As early as July 2, 2009, Harder reported improvement of her mental condition to Dr. Wilson as the result of medication. R. 249. Dr. Wilson's records, which span a period of roughly eighteen months, show largely unremarkable mental status exams with the exception of periods surrounding two extreme stressors: incarceration and the death of her mother. Harder's mental health condition was never so severe as to warrant hospitalization. R. 185. Moreover, the medical records also indicate that the impact of Harder's delusional disorder was limited to marital and domestic relationships rather than her ability to maintain employment. R. 185.

Furthermore, Dr. Braxton's conclusions of debilitating limitations do not follow from her own findings during her clinical interview of Harder. Dr. Braxton's report indicates that Harder's

chief complaint was memory problems, although Dr. Braxton's examination findings show no significant abnormalities associated with Harder's memory. R. 279, 281. Harder's appearance and interaction with Dr. Braxton was normal. Harder was nervous but cooperative and her emotional expressions were appropriate. Harder "denied perceptual disturbances and none were evident." R. 280. Dr. Braxton found Harder's "general fund of information" to be fair and her intellectual ability to be in the average range. It was from these mild clinical observations and review of the available records that Dr. Braxton found Harder to be limited in her "ability to perform simple, routine, repetitive tasks and maintain concentration, persistence and pace." R. 282. Dr. Braxton did, however, acknowledge Harder's ability to understand instructions, but that Harder may have difficulty retaining and following them.

The ALJ's opinion thoroughly reviewed the details of Dr. Braxton's April 2010 examination and opinion. R. 26–27. The ALJ did not wholesale reject Dr. Braxton's opinion, but instead incorporated the opinion into the RFC to the extent that the longitudinal record supported it—a decision within his discretion, given the longitudinal record above. Notably, Dr. Braxton's opinion does not address to what extent Harder's condition would "compromise" her functionality, only that she would be compromised in some way in performing simple tasks and maintain concentration. The ALJ agreed Harder would be compromised in these ways by providing for additional limitations in the RFC. The RFC provides that Harder can engage in simple, routine and repetitive tasks that are "free of fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes" and "involv[ing] no interaction with the public and no more than occasional interaction with co-workers and supervisors." R. 24–25. These limitations address Dr. Braxton's concerns about

Harder's functional limitations without adopting the portion of her opinion not supported by the longitudinal record. I find no error in the reasoning or the support for this decision.

Furthermore, Harder briefly held two jobs during the period of her alleged disability, another consideration the Commissioner may properly take into account in determining disability. "The work…that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level…[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. §404.1571. Harder worked at a company called Tri-Tech from December 2010 to February 2011, and was fired not for performance issues but because they had discovered her felony DUI conviction. R. 42. Harder also testified that worked at a candle company during April 2011, and was fired for sleeping on the job, which Harder claims was the result of her medication. R. 42. While far from dispositive, the fact that Harder held these jobs and the manner of her departure are evidence supporting the ALJ's decision.

Harder's self reported symptoms also lack credibility as the result of her inconsistencies in the record. For example, Harder reported to Dr. Braxton in April 2010 that she cannot "maintain her money" (R. 280) she indicated in her function report from October 2009 that she was able to pay bills, count change, handle a savings account, and use a checkbook. R. 155. Harder also denied past illicit drug use to some practitioners (R. 280) while admitting such use to others. R. 251–52. Harder also appears to not be fully forthcoming regarding her alcohol use and its impact on her condition, a concern raised by the state agency psychologists. In one Disability Determination Explanation, the state agency psychologist stated that "[t]o some extent alcohol abuse has played a role in her interpersonal and occupational problems, though in the absence of

a documented period of abstinence, it is not possible to say with certainty how big this role is." R. 186.

Moreover, the record also shows that Harder was able to perform a number of daily activities without assistance, which helps buttress the ALJ's decision. Although not a decisive factor on their own, activities of daily living are a relevant factor in evaluating a claimant's alleged disability, though the activities must be "vocationally relevant." Ausburne v. Barnhart, 2005 WL 1862642, at *3 (W.D. Va. 2005). Here, Harder reports in the record that she is capable of a wide range of daily activities that support the ALJ's final RFC. Harder is responsible for the care of her mother-in-law five days a week, which includes taking her to doctor's appointments, making her meals, and making sure she doesn't hurt herself around the house. R. 153, 156, 280. She performs chores to include taking care of her pets, cleaning, washing clothes, moving furniture, weedeating, hedging, and mowing the lawn with a push mower. R. 154, 214. She goes outside every day and attends church on a regular basis. R. 155, 216. Although Harder reported to Dr. Braxton that she was unable to "maintain her money" (R. 280) she indicated in the function report she personally filled out that she had no difficulty maintaining her finances. R. 155. Moreover, the function report itself was filled out by Harder independently. R. 159, 185. The record overall reflects that Harder is capable of independently managing her personal care and performing a wide range of vocationally relevant daily activities. This lends further support to the ALJ's decision that Harder was not disabled.

Finally, it should be noted that the ALJ discounted Dr. Braxton's opinion in part because of Harder's GAF score of 53 at the April 26, 2010 examination. The ALJ did not rely upon the GAF score as the sole reason to discount a portion of Dr. Braxton's opinion. A GAF score is "only a snapshot in time, and not indicative of [a claimant's] long term level of functioning," and

without additional context is not persuasive to the court. <u>Parker v. Astrue</u>, 664 F.Supp.2d 544, 557 (D.S.C. 2009). However, the substantial evidence in the record outlined above provides sufficient context to satisfy this court that the ALJ's decision was within his discretion when formulating Harder's RFC.

## **CONCLUSION**

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter:  January 21, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge